SIGNED THIS: July 26, 2012

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JASON R. HASKELL, | ) | Case No. 11-80231 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| DANCOR CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 11-8040 |
| | ) | |
| JASON R. HASKELL, | ) | |
| | ) | |
| Defendant. | ) | |

# O P I N I O N

This matter is before the Court after trial on the complaint filed by Dancor Construction, Inc. (DANCOR), the Plaintiff, against Jason R. Haskell, the Debtor

(DEBTOR), seeking a determination that certain debts arising out of three construction contracts are nondischargeable under sections 523(a)(2)(A) and (a)(6).

*Background*

Haskell Construction, Inc., a closely-held corporation, was incorporated in Illinois on March 19, 2009, and operated in the commercial construction industry as a subcontractor providing carpentry, drywall and painting services. After running into financial difficulties, the corporation ceased operations on October 22, 2010. The DEBTOR was the Vice President and Secretary and a 50% shareholder. Jared Haskell, the DEBTOR'S brother, was the President and owned the remaining 50% interest. The DEBTOR was in charge of the general financial operations of the company, including payroll and accounts receivable.

DANCOR, a general contractor, entered into three separate Subcontractor Agreements with Haskell Construction for carpentry work on three construction projects: a Beauty Brands Salon & Spa Superstore in Normal, Illinois; an AutoZone Store at 2449 West North Avenue in Chicago, Illinois ("AutoZone #4429"); and another AutoZone Store in Chicago, Illinois ("AutoZone #4435).[1] The Beauty Brands contract is dated November 11, 2009 and the AutoZone #4429 contract is dated March 15, 2010. The total amount to be paid Haskell Construction under the three contracts was $140,000. Pursuant to the terms of each of the contracts, Haskell Construction was required to furnish all of the materials, supplies and equipment necessary for the

---

[1] The relevant portions of the Beauty Brands and the AutoZone #4429 contracts were introduced into evidence. The contract for AutoZone #4435 is not a part of the record.

completion of the jobs. Each of the Subcontractor Agreements contained standard construction industry provisions regarding the submission of lien waivers, as follows:

> Partial payments for work performed under this Agreement will be made . . . within 15 days after being paid for the work by owner and will equal the value of the work done by Subcontractor according to owner's estimate at applicable unit prices or percentage of total completion, whichever is applicable, less the sum of previous payments and less a percentage equal to the percentage retained by owner; provided, that if Subcontractor is indebted to Contractor or anyone else for cash advances, supplies, materials, equipment, rental, or other property charges against the work, the amount of indebtedness may be deducted from any payment or payments made under this provision. Furthermore, Subcontractor will be required to provide trailing lien waivers, whether partial or final, and a complete list of its subcontractors and suppliers, with each of its final or partial lien waivers subsequent to the initial lien waiver supplied by Subcontractor, unless Subcontractor's initial waiver is a final lien waiver, in which case, Subcontractor shall be governed by the terms of final payment as set forth herein below.[2]
>
> Prior to final payment, Subcontractor will be required to furnish proof of payment of all taxes due. Subcontractor will further be required to furnish certification that all materials, labor, and applicable taxes are paid. Finally, prior to final payment, Subcontractor will be required to make full payment to, and supply final lien waivers from, all of its subcontractors and suppliers.
>
> On completion of the original contract and payment in full by owner, Subcontractor will be paid the remaining amount due under this Agreement. All prior partial payments will be subject to correction in the final payment.

DANCOR had not employed Haskell Construction prior to these three projects.

At the outset of the projects, the relationship between the parties proceeded in accordance with the payment provisions of the contract and customary practice in the

---

[2] The Beauty Brands contract provided that partial payments would be made by Syberus; the AutoZone #4429 contract provided that the partial payments would be made by DANCOR.

construction industry. Haskell Construction received the first progress payments, submitting initial lien waivers to DANCOR and thereafter suppliers submitted lien waivers on the trailing payments. During the interim phase of the projects, after the metal framing had been completed, Haskell Construction approached DANCOR, advising that it was unable to acquire the materials to complete the jobs and requesting that checks be issued to Haskell Construction and its material suppliers jointly.

Haskell Construction employed only union carpenters and painters, pursuant to collective bargaining agreements entered into with the Chicago Regional Council of Carpenters ("Carpenters Union") and the District Council No. 30 of the International Brotherhood of Painters and Allied Trades, AFL-CIO ("Painters Union").[3] Based on those agreements, Haskell Construction was required to submit monthly reports to each of those unions indicating the number of hours each covered employee worked for the respective time period and to timely make corresponding contributions to various fringe benefit funds for each hour worked by those employees. Although Haskell Construction paid its employees their wages, it had, at times, failed to timely pay the unions for the employees' fringe benefits and dues required under the collective bargaining agreements.

The AutoZone jobs were finished in February or March 2010, and Haskell Construction was paid in full up to the retainage amount on AutoZone #4429. The Beauty Brands job was completed in August or September that year, after encountering

---

[3] Haskell Construction had entered into collective bargaining agreements with the Chicago Regional Council of Carpenters (referred to herein as "Carpenters Union") and Painters District Council No. 30 (referred to herein as "Painters Union.")

...
...

a delay resulting from a strike by workers. Throughout that period, Haskell Construction was involved in other projects and it continued its work on those projects.[4]

Seeking to settle up on the three contracts, on October 25, 2010, Daniel J. Policicchio, Sr., the President of DANCOR, advised the DEBTOR by letter that it was due an amount in excess of $60,000 under the three contracts and that once it received those funds, it would be in a position to make payment to Haskell Construction. DANCOR set forth the amounts which were due Haskell Construction under the contracts and the amounts which were due Haskell Construction's suppliers under each contract that remained unpaid. Noting that some of those suppliers were threatening to file liens against the properties, DANCOR advised that it intended to pay the suppliers directly. AutoZone #4435 was "upside down," meaning that payments due Haskell Construction's suppliers exceeded the amount due Haskell Construction under its Subcontractor Agreement with DANCOR. According to the letter, DANCOR owed Haskell Construction only $2,708.49 on AutoZone #4435, but a payment of $6,831 was due to one of the suppliers.[5] The balance shown due Haskell Construction on AutoZone #4429 was $21,200 and the amounts due suppliers on that job totaled $14,801.28. A payment of $46,031.59 remained due on the Beauty Brands contract with

---

[4]According to the motion for relief from the stay filed in Haskell Construction's chapter 7 case, by the Chicago Regional Council of Carpenters Pension Fund and the Chicago Regional Council of Carpenters, other projects which Haskell Construction was working on included a Dollar General Store in Spring Valley, a PetSmart Store in Darien, a PetSmart Store in Peru, a senior living complex in Markham, and a clubhouse and community center in Glenwood. The motion reflected that the last day that union workers were on those jobs was various days during October, 2010.

[5]The amount owing Haskell Construction represented only the 10% retainage under the contract.

5

a payment of $9,573.55 due a supplier. Policicchio advised that in order to receive payment of the remaining funds, Haskell Construction would be required to submit a sworn statement representing that any other suppliers had been paid in full. He requested that the DEBTOR confirm the proposed payouts by signing the letter and providing the names of the suppliers on each of the projects in the appropriate spaces on the letter and return it to DANCOR, which the DEBTOR did. The letter made no reference to any amounts due the individual union members who worked on the jobs or the unions themselves. Attached to the letter is a handwritten list of suppliers used by Haskell Construction on each project. The DEBTOR signed the following representation on page 2 of the letter:

> I consent to the distribution of the funds and represent that all of our suppliers have been paid on the above jobs.
>
>         /s/ Jason Haskell
> Jason Haskell, individually
> and for Haskell
> Construction, Inc.

Thereafter, on November 22, 2010, the DEBTOR, on behalf of Haskell Construction, and Policicchio on behalf of DANCOR, entered into a Mutual Release Agreement, which purported to resolve all claims between them. In exchange for mutual releases, it provided for the payment by DANCOR to Haskell Construction of $27,500 and provided:

> SUBCONTRACTOR agrees to provide a final lien waiver and release of any lien recorded relating to the SUBCONTRACT. SUBCONTRACTOR represents and warrants that all material suppliers, employees, independent laborers and subcontractors have been paid and acknowledges that CONTRACTOR has relied on this representation in entering this agreement.

6

Haskell Construction agreed to indemnify DANCOR from any claims arising from the work performed under the contract. Of the amount provided for in the agreement, $5,000 represented a payment for labor to be provided on the Beauty Brands project in accordance with a change order, pursuant to which DANCOR was to reimburse Haskell Construction based upon proper documentation of hours worked.[6]

DANCOR met with the DEBTOR and Jared on December 1, 2010. At that meeting, the DEBTOR, on behalf of Haskell Construction, executed a partial lien waiver for the payment of $22,500, for the Beauty Brands project. The DEBTOR also executed a final lien waiver for the payment of $2,677.83, made in connection with the change order on that same project. The partial lien waiver provides, in pertinent part:

> The Subcontractor states that all persons who supplied labor, materials, equipment, services or tools to the Subcontractor in connection with all previous Payment Applications (other than the Payment Application referenced above) have been paid in full.

The final lien waiver contains the following language:

> The Subcontractor acknowledges that the Payment Amount, together with previous payments, represents full and final payment for work, labor, materials, equipment, tools and services supplied by or through the Subcontractor. The Subcontractor states that all persons who supplied labor, materials equipment, services or tools to the Subcontractor in connection with the Project have been paid in full.

During that meeting, a call was placed by Jared to the Laborer's Union in order to verify that all wages and fringe benefits had been paid.

---

[6] Haskell Construction returned to the Beauty Brands project on November 1, 2010, to complete additional work.

7

On January 25, 2011, the Painters Union filed a mechanics lien claim for $4,169.69 (against AZ # 4429 (2437 –55 West North Ave)) for unpaid contributions. On February 10, 2011, the Painters Union filed a lien claim for $5,110.65 against the Beauty Brands property for previously withheld unpaid contributions. On February 23, 2011, the Carpenters Union filed a mechanics lien claim for $1,417.32 against AZ #4429 (2449 W. North Avenue) for fringe benefits. On February 23, 2011, the Carpenters Union filed a mechanics lien claim for $2,141.15 against AZ #4429 for unpaid wages for three employees who worked during the month of October, 2010.[7] DANCOR paid each of those lien claims in full, obtaining releases of each lien claim.

Haskell Construction filed a chapter 7 petition on February 1, 2011.[8] The schedule of unsecured creditors discloses that the Carpenters Pension Fund was owed $78,455 for delinquent contributions and penalties; the Chicago Regional Council of Carpenters Welfare Fund was owed $45,838 for delinquent payments and penalties; the International Union of Operating Engineers was owed $28,657 for delinquent wages and fringe benefits; and the Painters District Council 30 was owed $19,750 for delinquent contributions. Both the Midwest Operating Engineers Fringe Benefit Funds and the North Central Illinois Laborers' Health & Welfare Fund were listed as holding claims for delinquent contributions and penalties in unknown amounts. Unsecured creditors totaled $334,950. The Central Laborers' Pension Fund filed a proof of claim for $659.86 as priority for contributions to an employee benefit plan and for $65.99, as

---

[7]Those employees worked on October 20th, 21st and 22nd.

[8]Case No. 11-80230.

8

unsecured. The Midwest Operating Engineers Fringe Benefit Funds filed a proof of claim for priority of $6,761.64, for fringe benefits.

On the same date that the petition was filed by Haskell Construction, the DEBTOR filed an individual chapter 7 petition. DANCOR brought this adversary proceeding against the DEBTOR, alleging that the amounts it paid to satisfy the mechanics lien claims is nondischargeable pursuant to sections 523(a)(2)(A) and (a)(6). The matter was tried on February 28, 2012.[9]

Robert Albertson, DANCOR'S senior project manager, testified that he oversaw construction projects from beginning to end. Albertson testified that Haskell Construction was required to submit lien waivers throughout the projects and at their completion, which showed payment to Haskell Construction as a subcontractor as well as payments by Haskell Construction to its suppliers, vendors, employees and laborers. He testified that he was aware that Haskell Construction had union employees on the jobs. Albertson testified that after the institution of the joint-check policy, DANCOR continued to require Haskell Construction to submit lien waivers from the suppliers and a contractor's sworn affidavit listing the material suppliers, vendors and laborers and the amounts paid to each. According to his testimony, based on invoices submitted by Haskell Construction, it was paid $6,300 on Auto Zone #4429; $18,000 on Auto Zone #4435 and $4,850.73 on the Beauty Brands project. Albertson testified that DANCOR, after paying the full amount of the contract on Auto Zone #4435 to Haskell

---

[9]DANCOR also filed a similar suit against Jared, which is proceeding in a different district.

9

Construction, learned that not all of the suppliers had been paid by Haskell Construction.

The DEBTOR testified that in accordance with the Subcontractor Agreements, Haskell Construction would submit invoices for each project for each month during which work was performed. The DEBTOR testified that he met with a representative from the Carpenter's Union on a monthly basis beginning in February or March, 2010, in order to catch up on fringe benefits. At that time, Haskell Construction was behind approximately $12,000, resulting from a job in Springfield. That default was cured by Haskell Construction by July, 2010. Haskell Construction fell behind again and met with representatives from the Chicago Regional office in late September, 2010. At that time, Haskell Construction owed approximately $50,000 for fringe benefits. The agreement called for payments of $9,000 each month, beginning in October. Haskell Construction issued a check in October, 2010, for the first installment, but it failed to clear due to insufficient funds. Although Haskell Construction's line of credit had not been cut off, it was maxed out. Haskell Construction's bank account was garnished by the Carpenter's Union in October, 2010. When that occurred, not all wages due employees had been paid, as a result of returned checks. Haskell Construction also failed to make the $9,000 payment due in November, 2010.

The DEBTOR testified that Haskell Construction ceased operations on October 22, 2010, because the Carpenter's Union had in effect shut them down. Though it was not uncommon for three to four checks given to employees to not clear Haskell

Construction's bank account on a weekly basis, those checks were made good immediately. He testified that when the three DANCOR projects were in progress, Haskell Construction continued to take on new projects.

The DEBTOR testified that while he disagreed that the amount set forth in the Mutual Release Agreement represented the full amount due Haskell Construction, he agreed to DANCOR's proposal because the funds were needed for other projects and Haskell Construction wanted to cut its losses. The DEBTOR believed that Haskell Construction was shorted about $12,000. According to the DEBTOR, at the time the Mutual Release Agreement was entered into, he believed Haskell Construction would continue to operate. The work which Haskell Construction had lined up at that time included an 80 unit senior housing development, two Culver's Restaurants, and two PetSmart stores. The DEBTOR admitted that he did not inform DANCOR of Haskell Construction's workout agreement with the Carpenter's Union, not because he was attempting to conceal Haskell Construction's liability, but because he did not believe that DANCOR had a need to know. Noting that the fringe benefits due the unions were not separately identified by construction project, the DEBTOR testified that he was not aware, at the time he signed the Mutual Release Agreement, that fringe benefits remained unpaid for workers on the DANCOR projects.

The DEBTOR testified that he did not dispute the amounts of the claimed mechanics liens. He testified that he did not know that unions could file liens for

11

unpaid fringe benefits, though he admitted that he knew that Haskell Construction would not be paid unless the lien waivers were signed.

*Analysis*

In order to effectuate the "fresh start" policy of the Bankruptcy Code, exceptions to discharge are narrowly construed against the creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548 (7th Cir. 2000). The claimant has the burden to prove each element of the exception to the dischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

Section 523(a)(2) of the Bankruptcy Code provides in relevant part as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

"False representation" refers to express misrepresentations, either oral or written. *In re Bowden*, 326 B.R. 62 (Bankr.E.D.Va. 2005). In contrast, "false pretenses" references implied misrepresentations or any conduct intended to create and foster a false impression. *In re August*, 448 B.R. 331 (Bankr.E.D.Pa. 2011). In order to establish an exception to discharge based on a false representation, a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) either knew was false or made with reckless disregard for the truth and (b) was made with the intent to

deceive or defraud, and (3) upon which the creditor justifiably relied. *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).

False representations concerning payments to subcontractors have been held to be actionable under section 523(a)(2)(A). *In re Dallam,* 850 F.2d 446 (8th Cir. 1988); *In re Morgan,* 2011 WL 3651327 (Bankr.N.D.Ill.); *In re Jackowiak,* 2009 WL 3930217 (Bankr.N.D.Ill. 2009); *In re Christensen,* 2005 WL 1941231 (Bankr.N.D.Ill. 2005); *In re Lennard,* 245 B.R. 428 (Bankr.M.D.Ga. 1999).

DANCOR's claim under this provision is based upon express misrepresentations made in the Mutual Release and in the partial and final lien waivers signed by the DEBTOR on behalf of Haskell Construction, attesting that suppliers and employees had been paid.[10] The DEBTOR does not dispute the validity or the amounts of the mechanics liens filed by the Unions. The Court will focus upon the representation made by the DEBTOR on behalf of Haskell Construction in the Mutual Release Agreement, which by its terms relates to each of the three projects. In contrast to that representation, both the partial and the final lien waivers which were executed on December 1, 2010, are specifically limited to the Beauty Brands project.

The representation in the Mutual Release, that "all material suppliers, employees, independent laborers and subcontractors have been paid," made on November 22, 2010, if it includes contributions to benefit funds, was undeniably false. DANCOR relies on *U.S. for Benefit and on Behalf of Sherman v. Carter*, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776

---

[10]Accordingly, the nonrepresentational forms of fraud need not be analyzed here.

(1957), a case brought under the Miller Act, holding that unpaid benefit fund contributions were "part of the consideration [the contractor] agreed to pay for the services of laborers . . . [and] were a part of the compensation for the work to be done by [the contractor's] employees." Contending that the Court's logic applies to the language of the Mutual Release, DANCOR maintains that a union employee has not been "paid" until the required trust fund contributions have been made. DANCOR'S interpretation of the language of the Mutual Release to encompass payment of all benefits due under the collective bargaining agreements is reasonable and one which the DEBTOR would be hard-pressed to dispute.[11] In fact, he does not do so.

Rather, the DEBTOR disputes that the misrepresentation was knowingly false. He testified at trial that he was not aware that a union could file a mechanics lien for unpaid fringe benefits. But the issue is not whether the DEBTOR was cognizant of the remedies available to the holder of a claim for unpaid wages or benefits, but whether he knew that the benefits and wages had not actually been paid for the union workers on the DANCOR projects. Based on the evidence at trial and observation of the testimony, this Court finds that if the DEBTOR'S affirmative representation in the Mutual Release Agreement that all employees and independent laborers had been paid was not made with actual knowledge of its falsity, it was at least made with a reckless disregard for the truth. His proffered explanation that he did not know for certain

---

[11] The evidence substantiates the inference that both DANCOR and the DEBTOR had a mutual awareness and understanding that the trust fund contributions were a necessary and unavoidable consequence of hiring union workers. Haskell Construction was a knowing and voluntary party to several collective bargaining agreements that, presumably, clearly spelled out its contribution obligations.

whether the amounts due the Unions included workers on the DANCOR projects is entirely disingenuous.  Since the DEBTOR was responsible for paying the bills of Haskell Construction, he was well aware of the substantial amounts regularly payable to the union trust funds and had complete knowledge of the company's failure to pay those obligations, having recently reached a repayment agreement with the Carpenter's Union.  He may not have known the total amount of the company's liability for unpaid union benefits, or the exact amount allocated to any one project, but he knew that the benefit plan contributions due for the work performed on the DANCOR projects had not been paid.

The DEBTOR denies that he intended to deceive DANCOR.  Direct evidence of a fraudulent intent is rarely before the court.  Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made.  *In re Monroe*, 304 B.R. 349 (Bankr.N.D.Ill. 2004).  An intent to deceive may be established through circumstantial evidence and may be inferred from the totality of the evidence.  *In re Kucera*, 373 B.R. 878 (Bankr.C.D.Ill. 2007).  Where a debtor knowingly or recklessly makes a false representations which the debtor knows or should know will induce another to act, an intent to deceive may be inferred.  *Matter of Sheridan*, 57 F.3d 627 (7th Cir. 1995); *In re Jairath*, 259 B.R. 308 (Bankr.N.D.Ill. 2001).

The Court finds that the DEBTOR had the intent to deceive, largely for the same reasons outlined above.  The DEBTOR'S testimony that at the time he signed the Mutual Release Agreement he remained optimistic that Haskell Construction would be able to continue in business and pay off the past due obligations to the Carpenter's

Union from future income, is no defense.  The DEBTOR testified that, in his view, DANCOR did not need to know of his agreement with the Carpenter's Union.  The DEBTOR'S optimism, however, was unwarranted.  At that point, Haskell Construction's financial condition was dire.  According to a motion filed by the Carpenter's Union, at the time the bankruptcy petition was filed by Haskell Construction, twenty-two of its members were owed approximately $105,000 in unpaid wages for work performed in September and October, 2010.  The DEBTOR admitted that the Carpenter's Union had effectively shut the business down in mid-October.  Haskell Construction's total debt exceeded $330,000.

Any doubt as to the DEBTOR'S fraudulent intent is dispelled by his response to DANCOR'S inquiry at the December meeting into unpaid benefits to members of the Laborer's Union.  Maintaining that DANCOR did not specifically inquire whether Haskell Construction owed any amounts to the Carpenter's or Painter's Unions, the DEBTOR remained silent after Jared, at DANCOR'S direction, confirmed by a telephone call that all benefits to that union had been paid.  His subsequent silence, in spite of his knowledge of the unpaid benefits owing to other unions, leads to the inescapable conclusion that he intended to deceive DANCOR.  He admitted the company desperately needed the DANCOR payment.

In essence, the DEBTOR argues that because he sincerely believed the company could recover, he thus did not intend to harm or cause DANCOR to suffer a loss.  This "defense," if it has any merit at all, is better directed at the claim for willful and malicious injury under section 523(a)(6).  The *mens rea* element under section 523(a)(2)

16

requires proof of an intent to deceive, not an intent to harm, which are two different things. It is abundantly clear that the DEBTOR'S state of mind satisfies the *mens rea* element of section 523(a)(2).

Lastly, the DEBTOR contends that DANCOR'S reliance on the representations was not justifiable. In order for a creditor's reliance to be "justifiable," something more than mere actual reliance is necessary, but the standard, less rigorous than that of reasonableness, is not considered a difficult one to meet. *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). It is not an objective standard, but is based upon the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *In re Cheeks*, 467 B.R. 136 (Bankr.N.D.Ill. 2012). Justifiable reliance requires only that the creditor not blindly rely upon a representation the falsity of which would be obvious with only a cursory inquiry. *In re Dobek*, 278 B.R. 496, 508 (Bankr.N.D.Ill. 2002). If, however, obvious red flags are raised, the creditor is required to investigate further. *In re Pawlak*, 467 B.R. 462 (Bankr.W.D.Wis. 2012).

Albertson testified that DANCOR relied on the DEBTOR'S representation that all employees/independent laborers had been paid. Albertson testified that DANCOR only made disbursements on construction projects upon the receipt of signed lien waivers by the subcontractors. No independent investigation of those representations was necessary. There is no evidence in the record that DANCOR knew that the DEBTOR'S representation that employees/independent laborers had been paid was false. Although it is clear that DANCOR was well aware of Haskell Construction's financial difficulties earlier on when the projects were underway, based on its inability

to obtain materials on its own, there was no indication that DANCOR was aware of the extent of Haskell Construction's insolvency. As Albertson testified, he would have had no way of knowing whether Haskell Construction had failed to pay the fringe benefits for union workers on DANCOR projects. DANCOR had a right to rely on the DEBTOR'S representation. A contrary rule would render lien waivers valueless.[12]

The exception to discharge under section 523(a)(2)(A) prevents the discharge of all damages flowing from the debtor's fraud, including punitive damages and attorney fees to which a creditor would be entitled under state law. *Cohen v. de la Cruz*, 523 U.S. 213, 221, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). In addition to compensatory damages of $12,838.81, the amount it paid to satisfy the mechanics liens filed against the projects, DANCOR seeks a determination of nondischargeability as to its attorney fees and punitive damages and a remand of the proceeding to state court in order to determine the amount of those additional damages. Punitive damages are disfavored under Illinois law, and are recoverable only in cases of intentional and outrageous misconduct. *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503 (7th Cir. 1997). The DEBTOR'S misrepresentation was not so egregious as to entitle DANCOR to punitive damages.

Under the American Rule applied in federal litigation, a prevailing litigant may not collect a reasonable attorney fee from his opponent unless authorized by statute or an enforceable contract between the parties. *Matter of Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997). This general rule applies to dischargeability litigation in bankruptcy courts.

---

[12] This Court is not aware of any precedent that suggests that a contractor has a duty to investigate or independently verify a subcontractor's representation of full payment to its suppliers, even where the contractor is aware of a subcontractor's financial difficulties.

*Id.* In *Cohen v. de la Cruz,* the prevailing party was awarded attorney fees because the New Jersey Consumer Fraud Act, the statute creating the cause of action, provided for fees to be recovered. The Supreme Court held that the fees were part of the nondischargeable debt. *Cohen* did not create a common law basis for awarding attorney fees or otherwise overrule or alter how the American Rule is applied by federal courts. *In re Hanson,* 225 B.R. 366 (Bankr.W.D.Mich. 1998); *In re Atchison,* 255 B.R. 790 (Bankr.M.D.Fla. 2000)(*Cohen* does not create an independent right to attorney fees for the prevailing party in a section 523 action).

Here, the cause of action was based upon a false representation made in the Mutual Release Agreement, which provides that Haskell Construction agreed to indemnify and hold DANCOR harmless as to any claims, including attorney fees, "arising from the work performed by [Haskell Construction]." The Agreement does not contain a provision for awarding fees in litigation between DANCOR and Haskell Construction concerning the enforcement of the Agreement itself. In this Court's view, the nondischargeability claim does not arise from the work performed by Haskell Construction. Instead, it arises from a contractual representation made, after the work was completed, in the Mutual Release Agreement. The prosecution of the nondischargeability claim is not covered by the contractual attorney fee provision. There is no statutory or contractual basis to award DANCOR fees incurred in litigating this dischargeability claim.

Because the Court has determined that DANCOR'S debt is nondischargeable under section 523(a)(2)(A), its claim under section 523(a)(6) need not be addressed.

19

Moreover, DANCOR'S debt, resulting from a false representation, which is specifically dealt with under section 523(a)(2)(A), should not be recast as a debt resulting from a willful and malicious injury. *See Jendusa-Nicolai v. Larsen*, 677 F.3d 320 (7th Cir. 2012); *In re Khouri*, 397 B.R. 111, 121 (Bankr.D.Minn. 2008); *In re Wish*, --- B.R. ----, 2012 WL 1721261 (Bankr. N.D.Ill. 2012)(recognizing limitations on section 523(a)(6)).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###